[Dkt. Ents. 266, 267, 275, 295]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

|  |  |
|---|---|
| MIGUEL DURAN, | : |
| Plaintiff, | : Civil Action No. |
|  | : 07-3589 (RMB/AMD) |
| v. | : |
|  | : **OPINION** |
| WARDEN GARY MERLINE, et al., | : |
| Defendants. | : |

APPEARANCES

Miguel Duran
        Pro Se Plaintiff

James T. Dugan, Esq.
Atlantic County Department of Law
1333 Atlantic Avenue, 8th Floor
Atlantic City, NJ 08401
        Counsel for Co-defendants Warden Gary Merline, Capt. James
D. Murphy, Yvonne Hickman, and John Solog

Jamie Nicole Labukas, Esq.
Joseph Goldberg, Esq.
Wendi D. Barish, Esq.
Weber Gallagher Simpson Stapleton Fires & Newby LLP
2000 Market Street, Suite 1300
Philadelphia, PA 19103
        Counsel for Co-defendant CFG Health Systems, LLC

Colleen M. Ready, Esq.
Ian Mark Sirota, Esq.
Peter S. Cuddihy, Esq.
Margolis Edelstein
100 Century Parkway, Suite 200
Mt. Laurel NJ 08054
        Counsel for Third-Party Defendant Aramark Correctional

Services, LLC

**BUMB,** UNITED STATES DISTRICT JUDGE:

Pro se plaintiff Miguel Duran brings this civil rights
action pursuant to 42 U.S.C. § 1983.  He asserts various
constitutional torts related to his pre-trial detention at the
Atlantic County Justice Facility.  Currently before the Court
are three summary judgment motions brought by defendant CFG
Health Systems LLC ("CFG") [Dkt. Ent. 266]; individual
defendants Warden Gary Merline, Captain James D. Murphy,
Principal Clerk Yvonne Hickman, and Case Worker John Solog (the
"County Defendants") [Dkt. Ent. 267]; and defendant Aramark
Correctional Services, LLC ("Aramark") [Dkt. Ent. 275].
Additionally, Plaintiff has included within his opposition brief
a section that appears to be a motion to amend the complaint.
[Dkt. Ent. 295.]  For the reasons that follow, the Court DENIES
CFG's motion; GRANTS Aramark's motion; partially GRANTS and
partially DENIES the County Defendants' motion; and DENIES
Plaintiff's motion to amend without prejudice.

## I. BACKGROUND

This case, with its long and protracted history, has
besieged the Court.  Plaintiff has filed a battery of motions,
letters, and exhibits.  He has also filed multiple appeals of
this Court's orders and the Magistrate Judge's discovery orders
to the Third Circuit, all of which have been dismissed as

frivolous or for lack of appellate jurisdiction. [Dkt. Ents. 224, 230.] In short, this case has required a tremendous amount of judicial resources. The parties are familiar with this history, so the Court recites only the relevant portions here. Plaintiff initiated this action on August 1, 2007, as a pre-trial detainee at the Atlantic County Justice Facility ("ACJF") in Mays Landing, New Jersey. Plaintiff was incarcerated from June 23, 2007 to August 2007, and from September 17, 2007 to May 28, 2009. As the Court has previously noted, these are the only dates that are at issue in this litigation.[2] [Dkt. Ents. 155, 227.] On February 16, 2009, Plaintiff's pro bono counsel, who has subsequently withdrawn from the case, filed a second amended complaint (the "Complaint"), which is the operative complaint in this matter.[3] [Dkt. Ent. 58.] The Complaint asserts claims against the County Defendants, Aramark, which provides food and sanitation services to the ACJF, and CFG, which provides medical services to ACJF inmates. All defendants have moved for summary

---

[2] It appears that Plaintiff was subsequently re-arrested in December 2009 and detained until January 2011. [Dkt. Ents. 227, 302.] He has not, however, successfully amended his Complaint to cover this later incarceration. [See, e.g., Dkt. Ent. 227.]
[3] The Court notes one caveat to this. Plaintiff subsequently filed a motion to amend [Dkt. Ent. 105], which was largely denied by Magistrate Judge Schneider. [Dkt. Ents. 127, 166.] Judge Schneider did, however, order that certain allegations from Plaintiff's proposed third amended complaint (Counts IX and XI, ¶¶ 192-99, 204-09) are deemed included in Counts One and Three, respectively, of the operative Complaint. [Dkt. Ents. 127, 166, 227.] The Court now considers the Complaint with these additional allegations included.

judgment.  Defendants' claims for injunctive relief have been
dismissed as moot.  [Dkt. Ents. 306, 341.]  Only Plaintiff's
claims for damages remain pending.

When Plaintiff initially filed his oppositions to the
defendants' motions, he sought permission to file an over-length
brief, which the Court granted, extending the page limit from 40
to 60 pages.  [See generally Dkt. Ent. 279.]  Plaintiff then
attempted to submit approximately 2,000 to 2,500 pages of legal
documents, including a 234-page brief in violation of the
Court's Order.  The Court deemed this submission withdrawn,
again ordered Plaintiff to limit his brief to 60 pages, and
permitted him an extension of time to do so.  The Court also
ordered Plaintiff not to attach his voluminous exhibits to his
brief but instead to make clear and concise references to his
exhibits with explanations as to why such exhibits are relevant.
The Court subsequently permitted Plaintiff to submit the
relevant exhibits, with instructions on how to file them in
order to assist the Court in understanding their relevance to
the multiple motions and claims.  Plaintiff did not comply with
the Court's Order.  After more than six months of delays,
Plaintiff finally submitted his exhibits with an index and
description, as required.[4]  [Dkt. Ent. 335 at pp.26-32 & Dkt.

---

[4] Plaintiff prefaced these exhibits with a brief that appears to
restate the facts and legal issues in the case and to request an

Ents. 335-1-9.]   These motions are finally ripe for
adjudication.

## II. LEGAL STANDARD

Summary judgment shall be granted if "the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a).  A fact is "material" if it will "affect the
outcome of the suit under the governing law . . . ." <u>Anderson
v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A dispute is
"genuine" if it could lead a "reasonable jury [to] return a
verdict for the nonmoving party."  <u>Id.</u> at 248.

When deciding the existence of a genuine dispute of
material fact, a court's role is not to weigh the evidence: all
reasonable "inferences, doubts, and issues of credibility should
be resolved against the moving party." <u>Meyer v. Riegel Products
Corp.</u>, 720 F.2d 303, 307 n.2 (3d Cir. 1983).  However, a mere
"scintilla of evidence," without more, will not give rise to a

---

evidentiary hearing.  The Court denies Plaintiff's request for a
hearing as moot, since this case will proceed to trial.  The
County Defendants, correctly, objected to Plaintiff's submission
to the extent that it seeks to re-brief his opposition papers.
[Dkt. Ent. 337.]  The Court will not view this submission as a
modification of Plaintiff's opposition papers but considers only
the attached exhibits, which Plaintiff has been permitted to
file in compliance with the Court's prior Orders.  The County
Defendants also objected to the relevance of certain exhibits,
such as "newspaper articles concerning suicides," but since the
Court does not rely on those exhibits, it need not address this
objection.

genuine dispute for trial.  Anderson, 477 U.S. at 252.  In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the non-moving party . . . ."  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "Summary judgment motions thus require judges to 'assess how one-sided evidence is, or what a 'fair-minded' jury could 'reasonably' decide.'"  Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460 (3d Cir. 1989) (quoting Anderson, 477 U.S. at 265).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).  The non-movant's burden is rigorous: it "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment.

<u>Orsatti v. New Jersey State Police</u>, 71 F.3d 480, 484 (3d Cir. 1995); <u>Acumed LLC v. Advanced Surgical Servs., Inc.</u>, 561 F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and conjecture may not defeat summary judgment.").

### III. DISCUSSION

Plaintiff asserts claims under 42 U.S.C. § 1983 for (1) unconstitutional conditions of confinement (Count I); (2) inadequate access to the courts (Count II); (3) interference with legal mail (Count III); (4) retaliation for exercising his constitutional rights (Count V); and (5) denial of medical care (Count IV).  Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Therefore, to succeed on his claims, Plaintiff must establish two elements: (1) a person deprived him or caused him to be deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was committed by a person acting under color of state law.  <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988).  Since the defendants do not dispute that they were acting under color of state law, the only issue before the Court is whether they caused Plaintiff to suffer deprivations of a

constitutional magnitude.  The Court considers each claim in
turn.

### A. Conditions of Confinement

Count I alleges a claim for unconstitutional living
conditions against defendants Warden Gary Merline and Aramark.
Both have moved for summary judgment.

#### 1. Warden Gary Merline

As an initial matter, the Court notes that the Complaint
does not specify whether Plaintiff sues Warden Merline in his
official or personal capacity.  This distinction is important
because "[p]ersonal-capacity suits seek to impose personal
liability upon a government official for actions he takes under
color of state law," while official-capacity suits "generally
represent only another way of pleading an action against an
entity of which an officer is an agent." Kentucky v. Graham,
473 U.S. 159, 165-66 (1985) (internal citations and quotations
omitted).  To determine the nature of the liability the
plaintiff seeks to impose, courts consider the complaints and
the "course of proceedings". Garden State Elec. Inspection
Srvs. Inc. v. Levin, 144 F. App'x 247, 251 (3d Cir. 2005)
(citing Graham, 473 U.S. at 167 n.14 (in turn quoting Brandon v.
Holt, 469 U.S. 464, 469 (1985)) and Melo v. Hafer, 912 F.2d 628
(3d Cir. 1990), aff'd, 502 U.S. 21 (1991)); Billman v. Corbett,
Civ. No. 10-2996, 2011 WL 605814, *2 n.3 (E.D. Pa. Feb. 15,

2011).

Here, Plaintiff's initial complaints indicated a desire to hold the municipality accountable.  The original complaint listed Defendant Merline on the first line of the docket caption with "Atlantic County Justice Facility" written on the line directly below it [Dkt. Ent. 1].  The amended complaint expressly included ACJF as a defendant [Dkt. Ent. 5].[5]

The operative Complaint challenges the long-standing conditions of confinement at the ACJF, which, as discussed below, suggest a custom, for which Defendant Merline may be liable in his official capacity as warden.  Montgomery v. De Simone, 159 F.3d 120, 126 (3d Cir. 1998) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691-94 (1978)) (municipal liability arises when an official custom or policy causes a constitutional deprivation); Hafer v. Melo, 502 U.S. 21, 25 (1991) (suit against municipal official in official capacity is essentially suit against municipality); Anela v. City of Wildwood, 790 F.2d 1063, 1069 (3d Cir. 1986) (long-standing detention conditions in city jail constituted "custom" for 1983 purposes).  However, the Complaint also alleges Defendant

---

[5] At the initial screening stage, the Court dismissed the claims against ACJF with prejudice, because a jail is not a "person" for § 1983 purposes.  Duran v. Merline, Civ. No. 07-3589, Dkt. Ent. 7, slip. op. at *11 (D.N.J. Mar. 11, 2008); Ingram v. Atl. Cnty. Justice Fac., Civ. No. 10-1375, 2011 WL 65915, *3 (D.N.J. Jan. 7, 2011) (citations omitted).

Merline's personal involvement in the disputed conduct; for example, by directing that fire and building inspections not take place because of overcrowding; by accepting additional inmates from the State of New Jersey; and by replacing the law library with a procedure for inmates to obtain legal information through a caseworker.  Compl. ¶¶ 39, 40, 54, 70, 86, 95, 104, 109.  These allegations suggest an intent to hold Merline personally liable as well.  <u>A.M. v. Luzerne Cnty. Juv. Detention Ctr.</u>, 372 F.3d 572, 586 (3d Cir. 2004) (supervisor may be personally liable by (1) establishing and maintaining unconstitutional policy, practice or custom, or (2) participating in violating plaintiff's rights, directing others to violate them, or acquiescing in subordinates' violations).

The "course of proceedings" also indicates that the parties believed Defendant Merline had been sued in both his official and personal capacities.  In his summary judgment papers, Merline asserts the protections of qualified immunity, a defense only available to officials sued in their personal capacity. <u>Graham</u>, 473 U.S. at 166-67; <u>Owen v. City of Indep.</u>, 445 U.S. 622, 650 (1980).  He also argues that he is not liable under a theory of <u>respondeat superior</u>, suggesting that he viewed this suit as an action against the municipality.  <u>Monell</u>, 436 U.S. at 691 (holding that a municipality cannot be held liable under 1983 on a respondeat superior theory); <u>Montgomery</u>, 159 F.3d at

126.  Plaintiff's opposition papers expressly argue that Merline should be held liable in his "official and individual capacity." Pl.'s Opp. Br. 20.  Plaintiff also notes that Merline retired in 2009 and that Sean Thomas is his "successor", Pl.'s Opp. Br. 15, a fact only relevant if Plaintiff sued Merline in his official capacity as warden.  Hafer, 502 U.S. at 25 (when officials sued in their official capacity die or leave office, their successors automatically assume their roles in the litigation); Graham, 473 U.S. at 166 n.11 (same).  Viewing these facts together, the Court concludes that Plaintiff sued Merline in both his official and personal capacities.

As for the merits of Count I, Merline moves for summary judgment on three grounds: (1) that the conditions of confinement at the ACJF did not amount to punishment in violation of Plaintiff's Fourteenth Amendment right to due process; (2) that Plaintiff's claims are based upon an impermissible theory of respondeat superior; and (3) that he is entitled to the protections of qualified immunity.  The Court considers these arguments seriatim.

### a. Constitutional Violation

Plaintiff claims that Warden Merline caused or permitted severe overcrowding, unsanitary conditions, and inhumane living conditions at the ACJF in violation of his constitutional rights.  Because Plaintiff was a pretrial detainee at the

relevant time, the Fourteenth Amendment's Due Process Clause governs his claims as opposed to the Eighth Amendment, which applies to convicted prisoners.  Bell v. Wolfish, 441 U.S. 520, 535-37 (1979); Hubbard v. Taylor, 399 F.3d 150, 164 (3d Cir. 2005) ("Hubbard I"); Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 581 (3d Cir. 2003).  The Due Process Clause prohibits "punishment" of a pretrial detainee prior to an adjudication of guilt in accordance with due process of law.  Bell, 441 U.S. at 535-37; Hubbard I, 399 F.3d at 164-65.  To determine whether conditions of confinement amount to "punishment", courts "ask, first, whether any legitimate purposes are served by the[] conditions, and second, whether the[] conditions are rationally related to these purposes."[6]  Hubbard v. Taylor, 538 F.3d 229,

_____

[6] Unconstitutional punishment in violation of the Fourteenth Amendment typically requires a finding of both an objective and subjective component.  Stevenson v. Carroll, 495 F.3d 62, 68 (3d Cir. 2007), cert. den'd, 552 U.S. 1180 (2008).  "[T]he objective component requires an inquiry into whether the deprivation was sufficiently serious and the subjective component asks whether the officials acted with a sufficiently culpable state of mind." Id. at 68 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991) (internal quotations and brackets omitted).  "The Supreme Court did not abandon this bipartite analysis in Bell, but rather allowed for an inference of mens rea where the restriction is arbitrary or purposeless, or where the restriction is excessive, even if it would accomplish a legitimate governmental objective."  Stevenson, 495 F.3d at 68 (citing Bell, 441 U.S. at 538-39 & n.20).  In other words the bipartite analysis is subsumed within Bell.  Thus,

> [A] particular measure amounts to punishment when there is
> a showing of express intent to punish on the part of
> detention facility officials, when the restriction or
> condition is not rationally related to a legitimate non-

232 (3d Cir. 2008) ("Hubbard II") (citing Union Cnty. Jail
Inmates v. Di Buono, 713 F.2d 984, 992 (3d Cir. 1983)).  As to
the first inquiry, the law is clear that Warden Merline had a
legitimate interest in managing the overcrowded conditions at
the ACJF.  Id. at 233 (recognizing "a county's interest in the
'management of [an] overcrowded institution'") (citing Union
Cnty., 713 F.2d at 993).

As for the second prong (whether these conditions are
rationally related to their purpose), the Court must consider a
further inquiry:  whether the conditions caused Plaintiff to
"endure such genuine privations and hardship over an extended
period of time," that they became "excessive in relation to the
purposes assigned to them."  Id. at 233 (citing Union Cnty., 713
F.2d at 992 (in turn quoting Bell, 441 U.S. at 542) (alterations
& quotations omitted).  While courts ordinarily defer to the
expertise of corrections officials in operating jails in a
manageable fashion, such deference is not required where
substantial evidence in the record shows the conditions to be
excessive.  Bell, 441 U.S. at 540 n.23 (citations omitted);
Hubbard II, 538 F.3d at 232.   The "excessiveness" analysis

_____

punitive government purpose, or when the restriction is
excessive in light of that purpose.
Stevenson, 495 F.3d at 68 (quoting Rapier v. Harris, 172 F.3d
999, 1005 (7th Cir. 1999)).  Here, as discussed below, the
inquiry turns on whether the conditions of confinement were
excessive in relation to their purpose.

requires courts to consider the totality of the circumstances,
including "the size of the detainee's living space, the length
of confinement, the amount of time spent in the confined area
each day, and the opportunity for exercise."[7] Hubbard II, 538
F.3d at 233.  The Third Circuit's decision in Hubbard II is
instructive.  There, the court held that requiring pretrial
detainees to sleep on mattresses on the floor in cells holding
three inmates for between three and seven months did not
constitute punishment in violation of the Fourteenth Amendment.
538 F.3d at 234-35.  The court stressed that the inmates had
access to large day rooms and that the record did not
substantiate the plaintiffs' claims that the use of floor
mattresses caused disease or led to the splashing of human waste
on them.  Id.  The court concluded that the conditions were not
constitutionally excessive given the totality of the

---

[7] The federal courts are split on the issue of whether forcing an
inmate to sleep on the floor on a mattress violates the
Constitution.  Hargis v. Atl. Cnty. Justice Facility, Civ. No.
10-1006, 2010 WL 1999303, *7 (D.N.J. May 18, 2010) (comparing
Lareau v. Manson, 651 F.2d 96, 107-08 (2d Cir. 1981) (finding
the practice violates the Eighth Amendment) and Thomas v. Baca,
514 F. Supp. 2d 1201, 1215-19 (C.D. Cal. 2007) (same), with
Sanders v. Kingston, 53 F. App'x 781, 782 (7th Cir. 2002)
(holding the Eighth Amendment does not require "elevated beds
for prisoners"); Mann v. Smith, 796 F.2d 79, 85 (5th Cir. 1986)
(same); and Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th
Cir. 1985) (same)).  The Third Circuit weighed in on the
question in Hubbard II, where it rejected a per se ban on the
practice in favor of a "totality of the circumstances" approach.
538 F.3d at 235.  Here, as discussed below, Plaintiff's claim
extends beyond the issue of sleeping on floor mattresses.

circumstances.  Id.

  According to Plaintiff, the ACJF was severely overcrowded,
such that its 7 x 12 foot cells, which were designed for one
inmate, housed three.  The dayroom space available was so
cramped that it did not provide space for recreation, dining, or
other activities outside the cell.  In his opposition papers,
Plaintiff avers that as a result of these conditions, he was
forced to sleep and eat his meals next to an open toilet for
fifteen months, where he was frequently splashed with urine,
feces, and other bodily fluids.[8]  These conditions led to the

---

[8] Plaintiff submitted an opposition brief that purports to be an
affidavit as permitted by 28 U.S.C. § 1746 (allowing unsworn
declarations made under penalty of perjury to qualify as an
affidavit).  However, Plaintiff's certifying statement is
problematic because it was not expressly made "under penalty of
perjury." Instead, at the end of his brief, Plaintiff states: "I
[Plaintiff] duly sworn that the above statement is true and
correct."  Pl.'s Opp. Br. 59.  On the following page, where
Plaintiff lists his exhibits, he states: "I recognized [sic]
that if any of the foregoing is willfully false I am subject to
punishment."  Plaintiff includes the date and his signature on
both pages.  In light of Plaintiff's pro se status and the broad
language used - referring to "any of the foregoing" - the Court
liberally construes these certifying statements to refer to his
opposition brief.  Higgs v. Atty. Gen. of the U.S., 655 F.3d
333, 339 (3d Cir. 2011) (citations omitted) ("The obligation to
liberally construe a pro se litigant's pleadings is well-
established.").  The courts are split on whether the phrase
"subject to punishment" may replace "under penalty of perjury"
under 28 U.S.C. § 1746.  Compare Bond v. Taylor, Civ. No. 07-
6128, 2009 WL 2634627, at *2 (D.N.J. Aug. 24, 2009) with Scott
v. Calpin, Civ. No. 08-4810, 2012 WL 301995, *1 n.1 (D.N.J. July
24, 2012)).  Here, the Court will consider the evidence
regardless of such a technical defect, since the County
Defendants did not object to it, and the Court would have
permitted the pro se Plaintiff to correct this error upon such

spread of disease and caused Plaintiff to suffer painful boils, rashes, and back pain.  Plaintiff avers that the overcrowded conditions also led to inmate-on-inmate violence, contributing to his assault by another inmate, which left him with a four-inch gash on his forehead.  Pl.'s Opp. 24; Pl.'s Ex. L.  The ACJF also had an extremely high level of noise, which caused Plaintiff to suffer headaches.  Plaintiff avers that he was only permitted recreational time in the yard or gym once a week.  He proffers multiple administrative grievance forms, letters, medical records, and his own affidavit to support these claims.

     In their moving brief, the County Defendants proffered affidavits from the current warden, Joseph Bondiskey, disputing the length of time Plaintiff endured these conditions, the amount of recreational time available, and the fact that Plaintiff slept on the floor.  Given summary judgment posture, however, the Court must resolve these facts in Plaintiff's favor.  The County Defendants did not file a reply responding to Plaintiff's opposition papers or these exhibits.

     Given the totality of the circumstances, a question of fact

---

an objection.  Indeed, "evidence should not be excluded on summary judgment on hypertechnical grounds."  Fowle v. C&C Cola, 868 F.2d 59, 67 (3d Cir. 1989).  Moreover, the County Defendants have also submitted "certifications" which are similarly made "subject to punishment" rather than "under penalty of perjury".  See Bondiskey Certs., Cnty. Defs.' Exs. E, F, G, H, I, J, M. Plaintiff did not object to these exhibits, and the Court considers them for the same reasons outlined above.

exists as to whether these conditions exceeded the bounds of the
Fourteenth Amendment.  These alleged conditions are
significantly worse than those alleged by the <u>Hubbard II</u>
plaintiffs.  First, while the cells in both cases are similarly
sized,[9] the day room space available to the <u>Hubbard II</u> plaintiffs
was approximately <u>ten times</u> larger than the day room space
available to a comparable number of ACJF inmates.[10]  Second, the
<u>Hubbard II</u> plaintiffs were only relegated to floor mattresses
for three to seven months, less than half the fifteen-month
period that Plaintiff claims to have endured the conditions
here.  Pl.'s Opp. 9.  Third, in <u>Hubbard II</u>, the record did not
substantiate the plaintiffs' allegations that the use of floor
mattresses resulted in "the splashing of human waste upon them."
538 F.3d at 235.  Here, however, Plaintiff has corroborated his
claim with letters, grievance forms, and his own affidavit.

---

[9] In <u>Hubbard II</u>, 538 F.3d at 234 n.4, the plaintiffs' cells
ranged from 69 to 76 square feet, while here, Plaintiff's cell
was 77 square feet.  Bondiskey Cert. ¶ 25, Cnty Defs.' Ex. F.
[10] In <u>Hubbard II</u>, 538 F.3d at 233-34, approximately 60 inmates
shared a 3,900 square foot day room, while here, approximately
65 inmates share a 400 square foot day room, Pl.'s Opp. 9.
Although the County Defendants claim the square footage of the
"common space" at ACJF is 792 square feet, Bondiskey Cert. ¶ 25,
Ex. F, they do not specify the size of the <u>day rooms</u> or clarify
whether the "common space" to which they refer includes such
non-day room space as bathrooms.  Plaintiff avers that,
according to the New Jersey Department of Corrections inspection
reports for 2007 and 2008, the dayroom area is only 400 square
feet.  Pl.'s Opp. 9.  The County Defendants did not file a reply
disputing this.  Given summary judgment posture, the Court
credits Plaintiff's version of the facts.

Plaintiff also proffered evidence concerning additional problems such as very limited recreational time (only once a week), extreme noise, violence, and the spread of disease.

Further, while the Hubbard II majority found the plaintiffs' claims unsubstantiated, Third Circuit Judge Sloviter filed a concurring and dissenting opinion in which she credited such claims (that the plaintiffs slept on floor mattresses where they were regularly splashed with bodily fluids) and found them shocking to the conscience in violation of the Fourteenth Amendment. Hubbard II, 538 F.3d at 239 (Sloviter, J., concurring/dissenting). Here, as discussed above, the conditions allegedly suffered by Plaintiff were more egregious than those in Hubbard II, and Plaintiff supported such claims with evidence in the record. Thus, it appears these facts create an issue for trial. Indeed, another court in this district, when presented with a nearly identical conditions-of-confinement claim against the ACJF, permitted the claim to proceed past the initial screening stage, noting that the plaintiff "may have suffered a worse fate than the plaintiffs in Hubbard II." Hargis v. Atl. Cnty. Justice Facility, Civ. No. 10-1006, 2010 WL 1999303, *8 (D.N.J. May 18, 2010). On this set of facts, the Court cannot conclude as a matter of law that the conditions of Plaintiff's confinement passed constitutional muster.

The County Defendants argue that the Court should consider certain efforts by the current warden and others to address the overcrowding problem at the ACJF.  Notably, these efforts took place after Plaintiff's incarceration at issue here.  Cnty. Defs. Ex. F (citing efforts beginning in December 2009, after Plaintiff's release in May 2009).  Thus, it is unclear what relevance, if any, these efforts have on Plaintiff's claim for past damages.  The County Defendants also point to the opinion in Nickles v. Taylor, Civ. Nos. 09-313, 09-557, 09-679, 09-952, 2010 WL 1949447 (D.N.J. May 14, 2010), for support.  Any reliance on Nickles is misplaced, however, since the plaintiff in that case relied only on conclusory assertions and did not proffer any admissible evidence to support his claims.  Id. at *4.

Accordingly, the Court denies summary judgment on this ground.

### b. Policy or Custom

Defendant Merline next argues that Plaintiff's claim fails because it relies on an impermissible theory of respondeat superior.  He contends that Plaintiff has not alleged a "policy or custom" of deliberate indifference.  It is well settled that in § 1983 cases, municipalities may not be held vicariously liable for the actions of their employees.  Montgomery v. De Simone, 159 F.3d 120, 126 (3d Cir. 1998) (citing Monell v.

19

Department of Social Servs. of City of N.Y., 436 U.S. 658, 691-94 (1978)).  Rather, such liability only attaches where the municipality had in place a custom or policy, which directly caused the constitutional deprivation.  Id.

Although the Complaint does not specifically refer to a "custom", the gravamen of Count I is that the County has a long history of operating the ACJF in an overcrowded and unsanitary manner.  The parties do not dispute that Warden Merline was well aware of the overcrowded conditions; in fact, Plaintiff proffered a letter from him in which he acknowledged that the ACJF has been overcrowded "for my 24 years here."  Merline Letter, July 2, 2007, Pl.'s (unnumbered) exhibit.  The Third Circuit has recognized that such long-standing conditions of confinement may reflect the existence of a custom for 1983 purposes.  Anela v. City of Wildwood, 790 F.2d 1063, 1069 (3d Cir. 1986) (holding that jail's long-standing conditions of confinement constituted a city "custom or usage" for Monell purposes); Bowers v. City of Phila., Civ. No. 06-3229, 2008 WL 5210256, *6 (E.D. Pa. Dec. 12, 2008) (same).  In light of the 24 years of overcrowding at the ACJF, a reasonable fact-finder could conclude that these conditions amounted to a custom, which caused the harm alleged by Plaintiff.  Further, Plaintiff has specifically identified the widespread custom of "triple-celling" inmates, which he claims has led to unsanitary

conditions, such as the splashing of urine and feces on him. Compl. ¶ 17, 92(b).  The County Defendants readily admit that they triple-cell inmates "during periods of overcrowding." (Bondiskey Cert., County Defs.' Ex. F ¶ 21.)  Since Plaintiff's claim clearly does not rely on a theory of respondeat superior liability, the Court rejects this argument.

### c. Qualified Immunity

Finally, Defendant Merline attempts to invoke the protections of qualified immunity.  As discussed above, Plaintiff has sued Merline in both his official and personal capacities.  Suits against municipal officials in their official capacity are essentially suits against the municipality.  Melo, 502 U.S. at 25.  Since municipalities are not protected by qualified immunity, Owen v. City of Indep., 445 U.S. 622, 650 (1980), Defendant Merline may not avail himself of such protection in his official capacity.[11]

To the extent Defendant Merline has been sued in his personal capacity, however, he is entitled to immunity.

---

[11] It appears Defendant Merline has since been replaced as warden by either Sean Thomas (Pl.'s Opp. 15) or Joseph Bondiskey (County Defs.' Ex. F).  His successor automatically assumes Merline's role in this litigation.  Hafer, 502 U.S. at 25; Fed. R. Civ. P. 25(d) (when a public officer who is a party in an official capacity ceases to hold office while the action is pending, "[t]he officer's successor is automatically substituted as a party").  Defendant Merline shall advise the Clerk of Court as to the name of his successor so that the Clerk may update the docket caption accordingly.

Qualified immunity shields government officials "from liability
for civil damages insofar as their conduct does not violate
clearly established statutory or constitutional rights of which
a reasonable person would have known."  See Pearson v. Callahan,
555 U.S. 223, 231 (2009) (citing Harlow v. Fitzgerald, 457 U.S.
800, 818 (1982)).  Since the Court has already found a
constitutional violation, it need only consider the second prong
of the familiar two-step qualified immunity analysis: whether
the right at issue was "clearly established" at the time of the
defendant's alleged misconduct.  Pearson, 555 U.S. at 236.  "A
right is clearly established for purposes of qualified immunity
when its contours are sufficiently clear that a reasonable
official would understand that what he is doing violates that
right."  Hubbard II, 538 F.3d at 236 (citing Williams v. Bitner,
455 F.3d 186, 191 (3d Cir. 2006), in turn quoting Saucier v.
Katz, 533 U.S. 194, 202 (2001)) (internal quotations omitted).
This standard "gives ample room for mistaken judgments by
protecting all but the plainly incompetent or those who
knowingly violate the law."  Id. (citing Gilles v. Davis, 427
F.3d 197, 203 (3d Cir. 2005), in turn quoting Hunter v. Bryant,
502 U.S. 224, 229 (1991)).

     The Third Circuit has acknowledged that its own precedent,
as well as that of the Supreme Court, has not clearly
established the degree of prison overcrowding that constitutes

"punishment" under the Fourteenth Amendment.  Hubbard II, 538
F.3d at 236 (noting that Third Circuit "precedents have never
established a right of pretrial detainees to be free from
triple-celling or from sleeping on a mattress placed on the
floor") (collecting cases); see also Bell, 441 U.S. at 541-43
(finding that double-bunking did not constitute punishment,
where detainees were detained for generally less than 60 days).
Indeed, in Hubbard II, as discussed in detail above, the Third
Circuit found that the overcrowded conditions did not amount to
a constitutional violation.  This analysis was very fact-
specific and required close consideration of all the
circumstances.  Against this backdrop, a reasonable official
might not have appreciated that the difference between the
circumstances in Hubbard II and those presented here was of
constitutional magnitude.  Thus, to the extent Plaintiff sued
Defendant Merline in his personal capacity, the Court grants
summary judgment as to that claim.

**2. Defendant Aramark**

Count I also asserts a claim against Defendant Aramark for
failing to perform the food and sanitation services it was
required to provide pursuant to its contract with the ACJF.  In
his deposition testimony, Plaintiff clarified the basis for this
claim.  He was served cold meals – bread, bologna, cheese, and
corn flakes - during a 45-day period while the ACJF kitchen was

23

being renovated.  Duran Dep. 164.  Later, during a two-day
incident, he and several other inmates contracted E. coli
poisoning due to "rotten" water, which had fallen onto their
food through cracks in their food trays.  Duran Dep. 95-96, 174-
76, 181.  A corrections officer subsequently investigated the
incident and discovered that 172 food trays had holes in them.
Duran Dep. 178-79.  In addition, Plaintiff claims he received
"many meals" that were "incomplete", meaning the bread was
missing or a serving of rice was replaced with beans.  Duran
Dep. 168-69, 200-01.  Plaintiff also believes the food he was
served was "diluted" with water, but he does not provide
specifics as to how many calories he received, when this
occurred, or how frequently.  Duran Dep. 169, 179, 190-91.
Plaintiff also believes, based on his sense of smell, that he
was sometimes served "spoiled" milk, eggs, and salad, but it is
unclear from the record how frequently this occurred, when it
occurred, and whether he was also given adequate quantities of
unspoiled food.  Duran Dep. 170.  Plaintiff believed the milk
was served past its expiration date due to the "rotation of the
milk" in the refrigerator.  Id.  Plaintiff claims he suffered
stomach pains and diarrhea as a result, but there is no evidence
of causation between the allegedly bad food and Plaintiff's
symptoms.  Duran Dep. 171.  Sometimes, Plaintiff and other
inmates received food that was combined with leftovers from the

day before, and when this occurred, they would refuse it and go without eating.  Id. at 170-71.  On one occasion, Plaintiff was served juice in a container that contained bits of leftover oatmeal in it.  Id. at 204-06.  At some unspecified time, he was also served food on trays that were dirty.  Id.

Aramark disputes Plaintiff's version of the facts and proffers the certification of Food Service Director Joseph Linnell, who describes the efforts he and his employees have made to ensure that the inmates at ACJF are served adequate food that has not spoiled.  Aramark's Ex. K.

Since this is a conditions-of-confinement claim, the Bell standard described above applies here:  Plaintiff must show that Aramark had a custom or policy of serving such inadequate or insufficient food that it amounted to "punishment" in violation of the Fourteenth Amendment's Due Process Clause.  Bell, 441 U.S. at 535; Natale, 318 F.3d at 583 (for government contractor to be liable, it must have had a custom or policy that caused the constitutional violation); Mora v. Camden Cnty., Civ. No. 09-4183, 2010 WL 2560680, *8 (D.N.J. June 21, 2010) (applying Bell to claim of inadequate nutrition).  The Constitution mandates that prison officials satisfy inmates' "basic human needs – e.g., food, clothing, shelter, medical care, and reasonable safety." Helling v. McKinney, 509 U.S. 25, 32 (1993) (citation omitted); Mora, 2010 WL 2560680, *8 (applying Helling

to pretrial detainee).  An inmate's diet must provide adequate
nutrition, but corrections officials may not be held liable
unless the inmate shows both an objective component (that the
deprivation was sufficiently serious) and a subjective component
(that the officials acted with a sufficiently culpable state of
mind).  Stevenson v. Carroll, 495 F.3d 62, 68 (3d Cir. 2007),
cert. den'd, 552 U.S. 1180 (2008) (quoting Wilson v. Seiter, 501
U.S. 294, 298 (1991) ("Unconstitutional punishment typically
includes both objective and subjective components."); Mays v.
Springborn, 575 F.3d 643, 648 (7th Cir. 2009).

Objectively, "[w]hether the deprivation of food falls below
this [constitutional] threshold depends on the amount and
duration of the deprivation." Berry v. Brady, 192 F.3d 504, 507
(5th Cir. 1999) (internal citation omitted).  As the Supreme
Court has stressed, "the length of confinement cannot be ignored
in deciding whether the confinement meets constitutional
standards.  A filthy, overcrowded cell and a diet of 'grue'
[providing 1000 calories a day] might be tolerable for a few
days and intolerably cruel for weeks or months." Hutto v.
Finney, 437 U.S. 678, 686-87 (1978).  Under the Eighth
Amendment, which provides a floor for the rights of pretrial
detainees, see Natale, 318 F.3d at 581, inmates must be served
"nutritionally adequate food that is prepared and served under
conditions which do not present an immediate danger" to their

health and well being.  Robles v. Coughlin, 725 F.2d 12, 15 (2d
Cir. 1983) (quoting Ramos v. Lamm, 639 F.2d 559, 571 (10th Cir.
1980)); Mora, 2010 WL 2560680.  "[U]nder certain circumstances,
a substantial deprivation of food may well be recognized as
being of constitutional dimension."  Id.

     Plaintiff has not satisfied this objective requirement.
Being served cold meals for a 45-day period, while the kitchen
was being renovated, is not "punishment" under Bell.  So long as
the food is nutritionally adequate, the mere fact that it is
unvaried or cold does not give rise to a constitutional
violation, particularly here, where the purpose in serving cold
food was to permit an upgrade to the jail's kitchen facilities.
See, e.g., Hamm v. DeKalb Cnty., 774 F.2d 1567, 1575 (11th Cir.
1985) ("A well-balanced meal, containing sufficient nutritional
value to preserve health, is all that is required.  The fact
that the food occasionally contains foreign objects or sometimes
is served cold, while unpleasant, does not amount to a
constitutional deprivation."); Daniels v. City of Hartford, 645
F. Supp. 2d 1036, 1060 (M.D. Ala. 2009) ("The fact that food is
served cold does not amount to a constitutional violation.  Nor
does an unvaried but reasonably well-balanced . . . menu
traverse the constitutional standard."); Blaxton v. Boca Grande
Foods, Civ. No 08-350, 2008 WL 4888852, *2 (N.D. Fla. Nov. 12,
2008) (complaint that food is room temperature or cold,

sometimes spoiled, and food trays and utensils are not always properly washed does not amount to cruel and unusual punishment); Harrison v. Moketa/Motycka, 485 F. Supp. 2d 652, 656 (D.S.C. 2007) ("[M]erely serving cold food does not present a serious risk of harm or an immediate danger to the health of an inmate."). Likewise, isolated instances of contaminated or spoiled food, while certainly unpleasant, are not unconstitutional. Cf. Hamm, 774 F.2d at 1575; Nickles v. Taylor, Civ. Nos. 09-313, 09-557, 09-679, 09-952, 2010 WL 1949447, *5 (D.N.J. May 14, 2010) ("A single or occasional incident involving spoiled food is insufficient to show that Plaintiff has been denied life's necessities."); Blaxton, 2008 WL 4888852, *2; Danneman v. Schoemehl, 601 F. Supp. 1017, 1018 (E.D. Mo. 1985) ("[A]n isolated instance of contaminated prison food does not rise to level of a constitutional violation[.]"); Freeman v. Trudell, 497 F. Supp. 481, 482 (E.D. Mich. 1980) ("An occasional incident of a foreign object finding its way into the food, while regrettable, does not raise a question of constitutional proportion."). There is no evidence that Aramark staff frequently served Plaintiff spoiled or contaminated food, that a significant portion of Plaintiff's diet consisted of such food, or that it caused more than temporary discomfort. Without such evidence, Plaintiff has not shown a substantial deprivation of food sufficient to establish a constitutional deprivation.

Cf. <u>Nickles</u>, 2010 WL 1949447, *5 (internal citation omitted).

Similarly, there is no evidence that Plaintiff was denied adequate nutrition in violation of the Fourteenth Amendment merely because he was served one food item (beans) when another (rice) ran out; because he was not served bread with his meal; or because he was served leftovers from the day before. While Plaintiff makes the conclusory assertion that his food was "diluted" with water, he has provided no specifics as to how frequently this occurred, whether he was also served non-diluted food, or how many calories he actually received. As such, the Court has no reason to believe that this amounted to a substantial deprivation of food sufficient to trigger constitutional protection. Likewise, the fact that Plaintiff was once served juice in a dirty container and food on a dirty tray does not amount to a constitutional violation. <u>Cf.</u> <u>Blount</u> <u>v. Folino</u>, Civ. No. 10-697, 2011 WL 2489894, * 13 (W.D. Pa. June 21, 2011) (internal citations omitted) (acknowledging case law "indicating that the service of food on unsanitary trays does not present an unreasonable risk of harm"). Viewing these alleged conditions together, they fall short of establishing a constitutional deprivation.

Additionally, Plaintiff has not proffered any evidence that Aramark officials possessed the requisite culpability to satisfy the subjective component of the analysis. Plaintiff must

establish that Aramark officials acted with "deliberate indifference" to his needs, meaning that they were subjectively aware of the alleged conditions and failed to reasonably respond to them.  Farmer v. Brennan, 511 U.S. 825, 829, 842 (1993); Mora, 2010 WL 2560680, at *9 (applying deliberate indifference standard to malnutrition claim).  The test for deliberate indifference is "subjective recklessness" as that concept is understood in criminal law.  Farmer, 511 U.S. at 839-40.  Here, Plaintiff's deposition testimony implicitly acknowledges that Aramark officials were either simply negligent or unaware of the complained-of conditions.  Farmer, 511 U.S. at 835 (acknowledging that "deliberate indifference" entails "something more than mere negligence").  For example, with respect to the E. coli incident, Plaintiff contends that this occurred because the food trays happened to have cracks in them, which allowed water to seep from one tray onto the next.  The record indicates that prison officials were unaware of such contamination until after it occurred.  Once it did occur, prison officials investigated the matter, discovered the problem, and, presumably, remedied it, since there are no allegations that it occurred again.  Plaintiff also contends that the reason the milk was sometimes served after its expiration date was due to the improper rotation of the milk in the refrigerator; suggesting, at most, that Aramark officials negligently rotated

the milk.  Moreover, Aramark has produced evidence showing that
it served milk that had not spoiled and that it served food that
was nutritious and sufficient in quantity.  See generally
Linnell Aff., Aramark's Ex. K.

Even if Plaintiff had established a constitutional
deprivation, he has not proffered any evidence to show that this
resulted from a custom or policy, which would render Aramark
liable under § 1983.  Natale, 318 F.3d at 583-84.  As set forth
above, "[a] policy is made when a decisionmaker possessing final
authority to establish policy with respect to the action issues
a final proclamation, policy or edict."  Id. at 584 (internal
citations and quotations omitted).  A custom "is an act that has
not been formally approved by an appropriate decisionmaker but
that is so widespread to have the force of law."  Id.  Here,
Plaintiff's testimony actually suggests the opposite, that the
complained-of conduct did not amount to a custom or policy, but
were isolated events.  For example, Plaintiff complains of a
two-day period when cracks in the food trays caused his food to
be contaminated.  He also complains of specific instances when
he was served spoiled milk, eggs, and salad; when he was given
certain food items in place of others; and when he was served
from a juice container that contained bits of leftover oatmeal.
While Plaintiff also complains of diluted food, he has not
specified how frequently this occurred or provided any evidence

suggesting that it resulted from a custom or policy. Accordingly, Plaintiff's claim against Aramark does not survive summary judgment.

## B. Access to Courts

Plaintiff also claims he has been denied meaningful access to the courts in violation of his First and Fourteenth Amendment rights.  Specifically, he alleges that Defendants Warden Merline and ACJF Case Worker John Solog have failed to provide him with adequate access to legal information.  The ACJF does not have an actual law library, but a social worker who provides legal materials through law library requests.  Plaintiff complains that due to ACJF policy, he is only permitted to receive 50 pages per week of Westlaw printouts unless he pays for additional pages, and it can therefore take up to two weeks to receive a 100-page case.  He alleges that this system has injured him in his attempts at litigating various claims.

The Constitution guarantees inmates a right of access to the courts.  See Lewis v. Casey, 518 U.S. 343, 346 (1996).  The Supreme Court has repeatedly recognized that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."  Lewis, 518 U.S. at 346 (quoting Bounds v. Smith, 430 U.S.

817, 828 (1977) (internal quotations omitted)).  This right is
not, however, unlimited.  Inmates may only proceed on access-to-
court claims with respect to (1) challenges to their sentences
(direct or collateral), (2) conditions-of-confinement cases, and
(3) pending criminal charges.  See Lewis, 518 U.S. at 354-55
(recognizing inmates' right to access courts "to attack their
sentences, directly or collaterally, and in order to challenge
the conditions of their confinement"); Hargis v. Atl. Cnty.
Justice Facility, Civ. No. 10-1006, 2010 WL 1999303, *6 (D.N.J.
May 18, 2010) (recognizing inmate's additional right to access
courts "with respect to legal assistance and participation in
one's own defense against pending criminal charges") (citing May
v. Sheahan, 226 F.3d 876, 883-84 (7th Cir. 2000) and Caldwell v.
Hall, Civ. No. 97-8069, 2000 WL 343229 (E.D. Pa. Mar. 31,
2000)).  Additionally, an inmate must show that the lack of
meaningful access to the courts caused him past or imminent
"actual injury".  See Lewis, 518 U.S. at 350-52; Oliver v.
Fauver, 118 F.3d 175, 177-78 (3d Cir. 1997); Hargis, 2010 WL
1999303, *6.  To do this, he must identify an "arguable,"
"nonfrivolous" underlying cause of action, either anticipated or
lost, and show that the prison's deficient program frustrated
his efforts to litigate that action.  Lewis, at 351-53;
Christopher v. Harbury, 536 U.S. 403, 415 (2002) (citing Lewis,
518 U.S. at 353 & n.3)).  To satisfy the "actual injury"

requirement,

> [An inmate] might show, for example, that a complaint
> he prepared was dismissed for failure to satisfy some
> technical requirement which, because of deficiencies
> in the prison's legal assistance facilities, he could
> not have known.  Or that he had suffered arguably
> actionable harm that he wished to bring before the
> courts, but was so stymied by inadequacies of the law
> library that he was unable to file even a complaint.

Lewis, 518 U.S. at 351.  Conclusory allegations that an inmate

suffered prejudice will not support an access-to-courts claim.

Arce v. Walker, 58 F. Supp. 2d 39, 44 (W.D.N.Y. 1999) (internal

citations omitted).

Plaintiff first asserts that he "has been unable to

effectively obtain information regarding his rights to a speedy

trial on his criminal charges, which has resulted in an extended

period of pre-trial detention in violation of his rights."

Compl. ¶ 96.  Since Plaintiff did not pursue this allegation in

his opposition papers or proffer any evidence to support it, the

Court presumes he has abandoned it.  Further, while the

Complaint does not specify whether Plaintiff had counsel in his

criminal proceeding, the Court notes that a state can fully

discharge its obligation to provide a prisoner with access to

the courts by appointing counsel.  See Lindsey v. Schaffer, 411

F. App'x 466, 469 (3d Cir. 2011) (citing Peterkin v. Jeffes, 855

F.2d 1021, 1042 (3d Cir. 1988) and Bourdon v. Loughren, 386 F.3d

88, 93-94 (2d Cir. 2004)).

The Complaint also alleges that due to the ACJF's law
library system, Plaintiff has been delayed in obtaining
necessary information to properly present his conditions-of-
confinement claim.  Compl. ¶ 97.  Like the allegation described
above, Plaintiff has apparently abandoned this claim as well,
since his opposition papers do not proffer any facts or evidence
to support it.  Further, Plaintiff has not pointed to anything
in the record to show that he suffered an actual injury to his
conditions-of-confinement claim as a result of the ACJF's law
library system.  Indeed, the record reflects the opposite: this
claim is part of the instant litigation, and the Court has
permitted it to survive summary judgment with respect to
Defendant Merline in his official capacity.  Plaintiff has
submitted hundreds of pages of documents in this case, including
extensive legal memoranda discussing the relevant case law.  He
has received 9,750 pages of legal materials from the WestLaw
electronic library between December 2007 and September 2010.
McNew Cert. ¶ 10, Cnty. Defs. Ex. C.  Accordingly, the Court
dismisses this claim.

In his opposition papers, Plaintiff cites two more
instances of purported misconduct: first, that the ACJF's law
library system prevented him from filing suit, and second, that
he made various procedural errors in his efforts to litigate his
civil rights suits and habeas petition.  Pl.'s Opp. Br. 41, 46-

47, Dkt. Ent. 295.  To seek civil redress for these new instances of purported misconduct, Plaintiff must seek leave to amend his pleading as prescribed by Federal Rule of Civil Procedure 15(a) and Local Civil Rule 7.1(f).  See Bell v. City of Philadelphia, 275 F. App'x 157, 160 (3d Cir. 2008) ("A plaintiff may not amend his complaint through arguments in his brief . . . .") (citations omitted).  Even if the Court were to consider Plaintiff's claims on the merits, however, they would fail since he has not proffered any facts or evidence to support them.  Further, the record belies his claims.  Plaintiff has filed six separate lawsuits, Duran Dep. 101, and to the extent he has made any procedural errors, there is no evidence that such errors prejudiced his cases in any way.  Indeed, this Court has acknowledged Plaintiff's pro se status on numerous occasions and given him considerable leniency in the multiple civil actions he has before this Court.  In Civil Action Number 10-4753, this Court gave Plaintiff the opportunity to amend his complaint three times, repeatedly clarifying for him the requirements of Federal Rule of Civil Procedure 8.  [See, e.g., Dkt. Ent. 341.]  Most recently in this civil action, the Court permitted Plaintiff five extensions of time – which, notably, he requested after leaving the ACJF – in order to submit exhibits supporting his claims.  [See Dkt. Ent. 333.]  Additionally, in Civil Action Number 10-294, this Court liberally construed a

petition that Plaintiff had erroneously filed under 28 U.S.C. §
2254 as if he had filed it under the proper statute, 28 U.S.C. §
2241. [See Dkt. Ent. 16-1, Civ. No. 10-294 (RMB).]

For these reasons, the Court grants summary judgment as to
Plaintiff's access-to-the-courts claim.

## C. Interference with Legal Mail

In Count III, Plaintiff alleges that Captain James Murphy,
a correctional officer at ACJF, Yvonne Hickman, a clerk at ACJF,
and John Solog, a caseworker at ACJF, have repeatedly opened his
legal mail outside of his presence and have refused to send such
mail or have held it for long periods of time without reason or
justification.  The County Defendants moved for summary judgment
on this claim, arguing that it would necessarily impugn a prison
administrative conviction in violation of Heck v. Humphrey, 512
U.S. 477, 486-87 (1994).[12]  Cnty. Defs. Br. 34.  They contend
that this claim stems from Plaintiff's administrative conviction
for fraud, which he received for attempting to disguise his
correspondence to Thomas Barlas, a local newspaper reporter, as
legal mail.  Cnty. Defs. Ex. D.  The parties do not dispute that
as a result of the Barlas incident, Plaintiff was charged,
adjudicated, and found guilty of perpetrating a fraud upon the
ACJF.

---

[12] Under Heck, a plaintiff may not bring a 1983 action for money
damages that, if successful, would call into question the
lawfulness of a conviction that has not been invalidated.  Id.

37

To the extent Plaintiff now attempts to challenge this conviction, which has never been invalidated, Heck bars such a claim. 512 U.S. at 487. It appears, however, that the crux of Plaintiff's claim concerns a pattern of interference with his legal mail unrelated to the Barlas incident, so Heck does not apply. 512 U.S. at 487 ("[I]f the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed[.]") (emphasis in original). Specifically, Plaintiff complains of a two-week incident in October 2007, when Murphy withheld his outgoing legal mail immediately after Plaintiff filed a grievance against Hickman. Pl.'s Opp. Br. 48-50; Pl.'s Exs. C & K, Dkt. Ents. 335-3 & 335-5. Plaintiff has produced hundreds of pages of administrative grievances, letters, court filings, and inter-office memoranda between ACJF correctional officers and Plaintiff, supporting his allegations against Murphy. Plaintiff claims that due to this incident, the criminal court did not receive several motions that he had attempted to file, resulting in his improper conviction, which was later overturned by the New Jersey Appellate Division. Id. The County Defendants did not address this "pattern" of interference with Plaintiff's legal mail. Nor did they file a reply disputing any of Plaintiff's factual assertions or

challenging any of the evidence proffered by Plaintiff against Murphy.[13]

While Murphy has asserted a general entitlement to qualified immunity as to all claims, he has not provided any explanation as to why he is entitled to such immunity with respect to this claim in particular.  Since the officer seeking to invoke the protections of qualified immunity carries the burden of proving its applicability, see Reedy v. Evanson, 615 F.3d 197, 223 (3d Cir. 2010), cert. den'd, 131 S. Ct. 1571 (2011) (citing Harlow v. Fitzgerald, 457 U.S. 800, 808 (1982)), he has failed to demonstrate the propriety of its application here.  In any event, in light of Plaintiff's well-established right of access to the courts, discussed above, the Court finds it doubtful that Murphy could establish his entitlement to such immunity since a jury could conclude that he deliberately withheld Plaintiff's outgoing legal mail during the two-week period described above.  See, e.g., Lewis v. Casey, 518 U.S.

---

[13] The County Defendants do, however, generally assert that all claims against Murphy fail because they rely upon an impermissible theory of respondeat superior.  They do not explain how this broad proposition applies to this claim. Indeed, Plaintiff has proffered significant evidence indicating that Murphy was personally responsible for withholding his legal mail.  Id.  Crediting Plaintiff's account, Judge Schneider and the criminal court did not receive the submissions he attempted to mail them; Plaintiff did not receive receipts for such legal mail, which would, presumably, have been customary; and Murphy undisputedly was involved in investigating Plaintiff's legal mail at the relevant time.

343, 346 (1996) (recognizing right of access to the courts);
Bounds v. Smith, 430 U.S. 817 (1977) (same); Nixon v. Sec'y Pa.
Dep't of Corr., -- F. App'x --, 2012 WL 4842257, *1 (3d Cir.
Oct. 12, 2012) ("[P]risoners, by virtue of their incarceration,
do not forfeit their First Amendment right to use of the
mails.") (quoting Jones v. Brown, 461 F.3d 353, 358 (3d Cir.
2006) (in turn quoting Bieregu v. Reno, 59 F.3d 1445, 1452 (3d
Cir. 1995)); Oliver v. Fauver, 118 F.3d 175 (3d Cir. 1997)
(recognizing interference with legal mail as part of right of
access to courts).  Accordingly, this claim survives summary
judgment with respect to Murphy.

Since Plaintiff has not submitted any evidence to support
his claims against Hickman and Solog, the Court grants summary
judgment as to these defendants.  Sharpe v. Medina, 450 F. App'x
109, 113 (3d Cir. 2011) ("[C]onclusory allegations, without
more, are not sufficient to defeat a motion for summary
judgment.  To avoid summary judgment, the nonmoving party must
produce evidence 'such that a reasonable jury could return a
verdict for [him].'") (quoting Zilich v. Lucht, 981 F.2d 694,
696 (3d Cir. 1992), in turn quoting Anderson v. Lib. Lobby,
Inc., 477 U.S. 242, 248 (1986)).

### D. Retaliation

Plaintiff alleges that as a result of the various
grievances he filed at the ACJF, the County Defendants

retaliated against him in violation of his constitutional rights
by (1) delaying or refusing to send out his legal mail, (2)
denying or limiting his access to legal information, (3)
transferring him to other county correctional institutions for
periods of time, and (4) holding him in solitary confinement at
times.  The County Defendants moved for summary judgment.

"Retaliating against [an inmate] for the exercise of his
constitutional rights is unconstitutional." Bistrian v. Levi,
696 F.3d 352, 376 (3d Cir. Sept. 24, 2012) (citing Mitchell v.
Horn, 318 F.3d 523, 529-31 (3d Cir. 2003); Rauser v. Horn, 241
F.3d 330, 333-34 (3d Cir. 2001); Allah v. Seiverling, 229 F.3d
220, 224-26 (3d Cir. 2000)).  To establish a retaliation claim,
the plaintiff must show three things: (1) he engaged in
constitutionally protected activity; (2) he suffered, at the
hands of a state actor, an adverse action that would be
sufficient to deter a person of ordinary firmness from
exercising his constitutional rights; and (3) the protected
activity was a substantial or motivating factor in the state
actor's decision to take adverse action.  Id. (citing Rauser,
241 F.3d at 333).  Even if the plaintiff satisfies each of these
elements, however, "prison officials may still prevail by
proving that they would have made the same decision absent the
protected conduct for reasons reasonably related to a legitimate
penological interest." Rauser, 241 F.3d at 334.

The County Defendants do not dispute that Plaintiff was engaged in constitutionally protected, First Amendment activity when he filed his grievances.   They only attack the second two prongs, and the Court limits its analysis accordingly.

### 1.  Interference with Legal Mail

With respect to Plaintiff's first claim (that ACJF officials retaliated against him by interfering with his legal mail), the Court denies summary judgment as to Murphy. Plaintiff has established a factual dispute as to whether Murphy withheld his outgoing legal mail during a two-week period in October 2007.  See supra.  Crediting Plaintiff's undisputed version of events, this conduct prejudiced his criminal case, resulting in a wrongful guilty verdict.  A reasonable jury could find that such circumstances would deter a person of ordinary firmness from filing additional grievances.  Cf. Hawkins v. Brooks, 694 F. Supp. 2d 434, 443 (W.D. Pa. 2010) (finding that defendants' conduct in withholding plaintiff's mail might deter a person of ordinary firmness from pressing charges or filing suit).  Plaintiff has thus satisfied the second Rauser prong.

As for the third Rauser prong, a fact-finder could reasonably conclude that Murphy began withholding Plaintiff's legal mail immediately after Plaintiff filed a grievance against

Hickman.[14]  Such unusually suggestive timing creates an inference

that Murphy withheld Plaintiff's legal mail <u>because</u> he filed

this grievance.  <u>DeFranco v. Wolfe</u>, 387 F. App'x 147, 154 (3d

Cir. 2010) (citing <u>Lauren W. v. DeFlaminis</u>, 480 F.3d 259, 267

(3d Cir. 2007)) (to establish the requisite causal connection

for a First Amendment retaliation claim, a plaintiff may prove

"an unusually suggestive time proximity between the protected

activity and the allegedly retaliatory action").  Plaintiff has

therefore satisfied both disputed prongs of the <u>Rauser</u> test.

   While Murphy could still prevail by proving that he would

have withheld Plaintiff's legal mail for some legitimate

penological reason unrelated to Plaintiff's grievance-filing,

<u>Rauser</u>, 241 F.3d at 334, he has not done so.  Accordingly, the

---

[14] With little assistance from either party as to the relevant
facts, the Court has labored to glean the following narrative
from the hundreds of pages of documents submitted by Plaintiff.
On October 9, 2007, Plaintiff filed a grievance against Hickman
on the grounds that she had withheld and reviewed his legal
mail.  Pl.'s Ex. K, Dkt. Ent. 335-5 at p. 31 & 43 of 84; Pl.'s
Ex. C, Dkt. Ent. 335-3 at p. 19 of 77.  Defendant Murphy
purported to investigate the matter, during which time Plaintiff
filed what appear to be multiple letters and grievances
asserting that Murphy's investigation was in reality a pretext
for him to delay or withhold Plaintiff's outgoing legal mail in
retaliation for his grievance against Hickman.  <u>See</u>, <u>e.g.</u>, Pl.'s
Ex. K at 32.  On October 21, 2007, Plaintiff sent what appears
to be a letter to ACJF administration officials, stating:
"It['s] been approximately 2 weeks and still the legal mail is
being held by Capt. Murphy in his office."  <u>Id.</u> at 33.  Two
weeks prior to October 21st was October 7th, and since Murphy's
investigation could not have commenced prior to October 9th, a
reasonable fact-finder could infer that Murphy began withholding
Plaintiff's legal mail immediately after October 9th.

Court denies summary judgment as to this claim insofar as it is asserted against Defendant Murphy.

With respect to the remaining County Defendants – Merline, Hickman, and Solog - the Court agrees with their contention that they lacked personal involvement in this retaliatory activity. "A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior." Solan v. Ranck, 326 F. App'x 97, 100-01 (3d Cir. 2009), cert. den'd, 130 S. Ct. 205 (2009) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (internal quotations omitted)). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Id. Specifically, a § 1983 complaint must allege "the conduct, time, place, and person responsible." Id. (quoting Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005)). Here, Plaintiff's claim against the remaining County Defendants relies on the vague allegation that "[a]s a result of the various grievances" filed by Plaintiff at the ACJF, "various actions have been taken against [him] by [the County Defendants]", including "delaying or refusing to send out legal mail". Compl. ¶ 110(a). Plaintiff's opposition papers are similarly devoid of any facts as to how Merline, Hickman, or Solog were personally involved in the interference with his legal mail. Accordingly, summary

judgment is granted as to them.

### 2. Access to Legal Information

The Court rejects Plaintiff's second claim; that ACJF officials retaliated against him by limiting his access to legal information.  As described in detail above, the record belies Plaintiff's claim that the County Defendants restricted his access to legal information in any meaningful way.  Moreover, Plaintiff has not cited any evidence showing that the County Defendants limited his access to legal information because of the grievances he filed.  Accordingly, the Court grants summary judgment as to this claim.

### 3. Transfer to Other Correctional Institutions

The Court also grants summary judgment on Plaintiff's third retaliation claim concerning his transfer to other county jails. Again, the County Defendants have correctly argued that Plaintiff has failed to show their personal involvement in this decision.  Plaintiff relies on the conclusory allegation that the County Defendants took "various actions" against Plaintiff "as a result of the various grievances" he filed, including "transferring [him] to other county correctional institutions for periods of time."  Compl. ¶¶ 109-110(c).  His opposition papers similarly provide no allegations specific to the County Defendants.  While Plaintiff cites two letters from Sergeant Michael Kelly (a non-party) regarding Plaintiff's transfer to

the Salem County and Hudson County jails, Pl.'s Opp. Br. 53, neither letter mentions or implicates any of the County Defendants.  Plaintiff has thus failed to carry his burden at this stage, and summary judgment is warranted.

Even if Plaintiff had established the County Defendants' personal involvement, however, he has not satisfied the second Rauser prong: that his transfer to other county jails constituted an "adverse action".  To establish an "adverse action", Plaintiff must show that his transfer would have deterred "a person of ordinary firmness from exercising his constitutional rights." Rauser, 241 F.3d at 333 (citations and quotations omitted).  In Rauser, the prisoner-plaintiff satisfied this prong where he "produced evidence that he was denied parole, transferred to a distant prison where his family could not visit him regularly, and penalized financially." Id. Here, Plaintiff has not proffered evidence showing that his transfer actually harmed him in any way.  In fact, the record suggests, in light of Plaintiff's numerous complaints about the conditions of his confinement at the ACJF, that a person of ordinary firmness would welcome a transfer out of this jail, particularly since the Court has no reason to believe that the jails to which Plaintiff was transferred had worse conditions. Plaintiff merely relies on the bald assertion that his transfers delayed his receipt of medical assistance.  He has not, however,

identified anything in the record to support this contention, and despite poring through Plaintiff's voluminous medical records, the Court has been unable to identify any such records from these other institutions.  Accordingly, the Court grants summary judgment on this claim.

### 4. Placement in Solitary Confinement

This claim also fails due to the County Defendants' lack of personal involvement.  Plaintiff relies only on the conclusory allegation that "as a result of the various grievances [he] filed at the ACJF, various actions have been taken" against him by the County Defendants, including "holding [him] in solitary confinement, allegedly as a result of an altercation involving another detainee . . . ."  Compl. ¶ 109-10.  Plaintiff has provided no specifics as to how the County Defendants were involved in his placement in solitary confinement, such as whether they personally directed such placement or had actual knowledge of his placement and acquiesced in it.  Plaintiff has also failed to set forth the relevant time, place, or conduct.  His opposition papers are similarly conclusory and unhelpful.[15]

---

[15] Plaintiff only mentions the County Defendants with respect to this claim in the following portion of his opposition brief:
> Plaintiff claims that the following defendants conspired to inflict, oppress, int[i]midate, and to punish the plaintiff as a result of the various grievances and section 1983 which plaintiff filed at the [ACJF][.] Various actions have been taken against plaintiff by defendants and the[i]r conspiratories.

While Plaintiff again cites some evidence to support his claim, including Kelly's letters pertaining to his transfer, such evidence only implicates Kelly and ACJF official Sean Thomas, neither of whom are parties to this action.[16]   Accordingly, summary judgment as to this claim is granted.

### E. Denial of Medical Care

Finally, Plaintiff brings a claim for denial of medical care against CFG and Warden Merline in his official capacity (the "Medical Defendants").[17]   Plaintiff claims he has Hepatitis C and that the Medical Defendants were aware of this fact and refused to provide him treatment because it would be too costly. Compl. ¶ 104.   He claims his liver was damaged as a result.   CFG moved for summary judgment on this claim, and Defendant Merline joined in that motion.   Cnty. Defs.' Br. 30.   The Medical Defendants argue that they did not act with deliberate indifference in their treatment of Plaintiff and that they may not be held liable pursuant to a theory of <u>respondeat superior</u>. The Court addresses each argument in turn.

### 1. Constitutional Violation

_____

Pl.'s Opp. Br. 52.   Plaintiff then lists the individual County Defendants as well as others who are not parties to this action.
[16] Although Thomas may replace Merline in the official capacity suit against the warden of ACJF, he has not been sued in his personal capacity, which is implicated here.
[17] Since Plaintiff has not alleged that Merline had any personal involvement in the denial of medical care, this claim is apparently alleged against Merline only in his official capacity as warden.

Since Plaintiff was a pretrial detainee at the relevant time, the Fourteenth Amendment's Due Process Clause governs his claim for inadequate medical care.  Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 581 (3d Cir. 2003).  Courts assess such claims under the familiar "deliberate indifference" test set forth in Estelle v. Gamble, 429 U.S. 97, 103-05 (1976), and more commonly applied in the Eighth Amendment context.  Brown v. Deparlos, -- F. App'x --, 2012 WL 2512014 *2 (3d Cir. July 2, 2012) (citing Estelle standard and Natale, 318 F.3d at 581); Hubbard v. Taylor (Hubbard I), 399 F.3d 150, 166 & n.22 (3d Cir. 2005) (citing Estelle standard).  Under this standard, "evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need."  Natale, 318 F.3d at 582 (citing Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)).

Plaintiff has established that he has Hepatitis C.  The Medical Defendants do not dispute that this is a serious illness or that Plaintiff has a serious medical need.  They only contest the second prong.  The question, then, is whether CFG's health care providers acted with deliberate indifference in denying Plaintiff treatment for his Hepatitis C condition.

The test for "deliberate indifference" is "subjective recklessness" as that concept is understood in criminal law. Farmer v. Brennan, 511 U.S. 825, 839-40 (1994); Natale, 318 F.3d

49

at 582.  This standard requires that the prison official "knows
of and disregards an excessive risk to inmate health or safety;
the official must be both aware of facts from which the
inference could be drawn that a substantial risk of serious harm
exists, and he must also draw the inference."  <u>Farmer</u>, 511 U.S.
at 837; <u>Natale</u>, 212 F.3d at 582.  The Third Circuit has found
"deliberate indifference" in a variety of circumstances,
including where (1) "there was objective evidence that a
plaintiff had a serious need for medical care, and prison
officials ignored that evidence"; and (2) "where necessary
medical treatment is delayed for non-medical reasons."  <u>Natale</u>,
212 F.3d at 582 (internal citations, quotations, and brackets
omitted).  Here, the facts support Plaintiff's contention that
his doctors (1) knew of his need for medical treatment and (2)
intentionally denied such treatment for a non-medical reason
(its cost).

   <u>First</u>, CFG does not dispute that its medical staff knew of
Plaintiff's diagnosis with Hepatitis C and that a failure to
treat this condition could cause serious injury.  Plaintiff's
medical records from 2008 indicate that he repeatedly requested
treatment for his Hepatitis C condition; he informed CFG
employees of his efforts to obtain such treatment prior to his
detention; and CFG employees denied his requests.  Pl.'s Medical
Treatment Notes, Pl.'s Ex. S, Dkt. Ent. 335-7 at p. 62-64 and 72

of 79 & Dkt. Ent. 335-8 at p. 23, 45-51 of 119; Pl.'s Opp. Br.
13 & 7-8, 31.[18]   Specifically, Plaintiff avers that on April 3,
2008, Joann M. Loeffler, a nurse with CFG, informed him that he
could not receive treatment for Hepatitis C because it was "too
expensive", and neither the County nor CFG would cover such
treatment.  Pl.'s Opp. Br. 13 & 7-8, 31 (citing "CFG Discovery"
p. 140, 185).[19]   When Plaintiff sought treatment again one month
later, Nurse Loeffler told him "there was nothing they could
do."  Id.  Notably, Nurse Loeffler did not tell Plaintiff that
he did not require such treatment.[20]   Based on these facts, a

---

[18] Plaintiff informed the medical staff that at the time he was
incarcerated he had been in the process of getting treatment for
Hepatitis C at a local clinic known as Rescue Mission.  Id.  On
multiple occasions during his incarceration, he complained of
blood in his stool and pain in the area of his liver.  Id.
Plaintiff also submitted multiple grievances to prison
administrators requesting Hepatitis C treatment.  Pl.'s
Grievances, Pl.'s Ex. S, Dkt. Ent. 335-8.
[19] Plaintiff submitted an opposition brief that purports to be a
sworn statement as permitted by 28 U.S.C. § 1746.  Plaintiff
again uses the phrase "subject to punishment" rather than "under
penalty of perjury", the words explicitly invoked by the
statute.  Nevertheless, the Medical Defendants did not object to
this technicality, and the Court therefore considers this
evidence for the same reasons discussed at footnote 7.
[20] In May of 2010, after Plaintiff initiated this action against
CFG, Dr. James Neal, CFG's director for medical services,
recognized the need to address Plaintiff's Hepatitis C condition
and referred him to an infectious disease specialist, who
recommended treatment with Interferon and Ribavirin.  Pl.'s Ex.
S, Dkt. Ent. 335-7 at 21 of 79.  However, to the extent Dr.
Neal's referral may be viewed as a remedial measure pursuant to
Federal Rule of Evidence 407, it is inadmissible to prove CFG's
culpable conduct.  Fed. R. Evid. 407 ("When measures are taken
that would have made an earlier injury or harm less likely to
occur, evidence of the subsequent measures is not admissible to

jury could reasonably infer that Nurse Loeffler believed Plaintiff required such treatment but did not provide it to him.

Second, the record also reflects that Nurse Loeffler denied such treatment due to its cost. As discussed above, Nurse Loeffler informed Plaintiff that he could not receive treatment for Hepatitis C because it was "too expensive" and neither the County nor CFG would cover such treatment. One month later, Nurse Loeffler again denied Plaintiff treatment, telling him "there was nothing they could do." Plaintiff continued to complain about his liver condition and filed over 40 sick call slips. Pl.'s Opp. Br. 13 & 7-8, 31 (citing "CFG Discovery" p. 140, 185). ACJF's treatment notes corroborate that Nurse Loeffler treated Plaintiff on the alleged dates and that he complained of Hepatitis and "liver pain". Pl.'s Ex. S, Dkt. Ent. 335-7 at p. 62-64 of 79. The record also shows, consistent with Plaintiff's version of events, that while Plaintiff was given Tylenol, Motrin, and Pepto Bismol for pain, his requests for treatment of his Hepatitis C condition were denied until after he had initiated this action against CFG. Pl.'s Ex. S; CFG's Statement of Undisputed Material Facts ("SUMF") ¶ 26.

The Medical Defendants argue that the decision not to treat Plaintiff was based on sound medical judgment by Plaintiff's doctors. To support this contention, they point to laboratory

---

prove . . . culpable conduct[.]").

results, dated May 3, October 21, and October 29, 2008.  CFG's
Ex. D.  The Medical Defendants make much of the Glomerular
Filtration Rates ("GFR") reported in these results.  According
to the lab reports, "[a] calculated GFR of <60 mL suggests
chronic kidney disease, but only if found consistently over 3
months."  Id.  Plaintiff's GFR was 110.22 mL/min/1.73m2 on May
20th, 84.99 on October 21st, and not calculable on October 29th.
Id.  The Medical Defendants claim these lab results show that
Plaintiff did not have an acute liver infection related to his
Hepatitis disease and therefore did not require treatment.
CFG's SUMF ¶ 19.  Plaintiff disputes this.  Since the Medical
Defendants have not proffered any medical expert opinion to
support their interpretation of the data, the Court does not
adopt it.  Indeed, absent such evidence, the Court sees no
reason to infer from data pertaining to Plaintiff's kidneys that
he did not require treatment for his Hepatitis C, a liver
disease.  6 Attys. Med. Advisor § 53:24 Hepatitis ("Hepatitis C
is associated with chronic remitting/relapsing hepatitis which
tends to end in cirrhosis of the liver.").  More importantly,
CFG has not produced any evidence that its medical professionals
based their decision not to treat Plaintiff on these lab
reports.  Plaintiff aptly points out that such an assessment is
conspicuously absent from his medical records.  The Court agrees
and rejects this argument.

Next, CFG points to an affidavit from Dr. Neal, dated April 30, 2010, in which he avers that Plaintiff was not "a candidate" for Hepatitis C treatment because (1) Plaintiff was using marijuana, cocaine, and ecstasy at the time of his arrest in June 2007; and (2) he was receiving treatment for depression. Neal Aff. ¶ 11, CFG's Ex. D; CFG's SUMF ¶¶ 21-22.  Plaintiff argues that this is a post hoc justification for the denial of treatment, as evidenced by the complete absence of this assessment in his medical records.  After a careful review of Plaintiff's medical records, the Court agrees.  Plaintiff also undercuts Dr. Neal's affidavit by correctly noting that (1) Plaintiff's request for treatment was denied long after his drug use had ended, when he had been "clean" for almost a year; and (2) Dr. Neal had no problem referring Plaintiff to an infectious disease specialist for Hepatitis C treatment less than a month later, as evidenced by his treatment plan, dated May 20, 2010. Pl.'s Opp. Br. 6; Pl.'s Ex. S, Dkt. Ent. 335-7 at p.58 of 79. In any event, the Court notes the precise wording of Dr. Neal's affidavit; he merely states that Plaintiff would not have been a candidate for such treatment and never avers that Plaintiff was actually denied treatment because of his history of drug use and depression.

Based on these facts, a reasonable jury could conclude that CFG staff believed Plaintiff's Hepatitis C condition was a

serious medical condition that required treatment and that they denied such treatment because it was too costly in violation of Plaintiff's Fourteenth Amendment rights.

### 2. Policy or Custom

The Court must now determine whether this alleged violation resulted from a custom or policy.  As set forth above, "[a] policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict." Natale, 318 F.3d at 584 (internal citations, quotations, and brackets omitted).  "A custom is an act that has not been formally approved by an appropriate decisionmaker, but that is so widespread as to have the force of law." Id. (internal citations and quotations omitted).  Nurse Loeffler told Plaintiff that neither the County nor CFG would provide treatment for Plaintiff's Hepatitis C condition because it was "too expensive", and "there was nothing they could do".  Plaintiff repeatedly requested such treatment and was repeatedly denied it.  A reasonable inference from these facts is that the Medical Defendants had a custom or policy of refusing medically necessary treatment due to cost.  Indeed, Nurse Loeffler told Plaintiff this was the reason she would not treat him, and, consistent with her statement, he was subsequently denied treatment on multiple occasions. Accordingly, the Court denies summary judgment as to this claim.

### F. Motion to Amend

Within his opposition brief to the County Defendants'
motion for summary judgment, Plaintiff has included a section
entitled "Statement of desired to add to the pleadings and
amend". [Dkt. Ent. 295 at p. 57.]  What follows appears to be a
third amended complaint.[21]  The Court thus construes this as a
motion to amend.  On October 2, 2009, U.S. Magistrate Judge
Schneider issued a Scheduling Order setting October 30, 2009, as
the deadline by which Plaintiff was required to file his motion
to amend the complaint. [Dkt. Ent. 89.]  Plaintiff subsequently
filed a motion to amend, which Judge Schneider denied without
prejudice on December 10, 2009.  In that December 10th Order,
Judge Schneider required Plaintiff to file any subsequent motion
to amend by December 31, 2009. [Dkt. Ent. 127.]  Plaintiff's
pending motion to amend was filed on December 20, 2010, nearly
one year after the deadline imposed by Judge Schneider to file
this motion.[22]  [Dkt. Ent. 295.]

---

[21] Although Plaintiff has not explained how this amendment
modifies the operative Complaint, it appears to leave his claims
substantively the same or similar but to add several new
defendants.
[22] Plaintiff was well-aware of the December 31, 2009 deadline.
Indeed, he filed another motion to amend on March 16, 2010.
[Dkt. Ent. 174.] Judge Schneider denied that motion on the
merits but also acknowledged that the untimeliness of the motion
provided "sufficient justification" to deny it.  [Dkt. Ent.
227.]

Under Federal Rule of Civil Procedure 15(a)(2), "[a] court should freely give leave [to amend] when justice so requires." However, many courts have held that where the Court-ordered deadline for filing an amended pleading has passed, the party seeking to amend the pleading must first show "good cause" to justify a modification of the scheduling order under Rule 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). 6A Wright, Miller, & Kane, et al., Fed. Prac. & Proc. § 1522.2 n.3 ("[T]he Rule 16(b) standard controls any decisions to alter a scheduling order for purposes of making pleading amendments and it must be satisfied before determining whether an amendment should be permitted under Rule 15.") (collecting cases). Although the Third Circuit has not explicitly ruled on this issue, it has suggested that it would come to the same conclusion. See E. Minerals & Chem. Co. v. Mahan, 225 F.3d 330, 339-340 (3d Cir. 2000) (affirming district court's denial of motion to amend complaint under Rule 16(b) six months after amendment deadline had expired); Dimensional Commc'ns, Inc. v. OZ Optics, Ltd., 148 Fed. Appx. 82, 85 (3d Cir. 2005), cert. den'd, 546 U.S. 1209 (2006) (non-precedential) (citing Dimensional Commc'ns); Price v. Trans Union, LLC, 737 F. Supp. 2d 276, 279-80 (E.D. Pa. 2010) (noting that the Eastern District of Pennsylvania "has already concluded that the Third Circuit would likely come to the same conclusion" that plaintiff

must first satisfy Rule 16(b)).  In determining whether "good cause" exists, courts generally consider the diligence of the party seeking the modification of the scheduling order.  Wright, Miller & Kane, supra, n. 5; Price, 737 F. Supp. 2d at 279 ("'Good cause' . . . focuses on the diligence of the party seeking the modification[.]") (citations omitted).  Here, Plaintiff has not given the Court any reason to believe that he acted diligently in filing this motion.  He has merely included what appears to be a proposed third amended complaint without any explanation for his one-year delay in filing it.  Accordingly, the Court denies his motion without prejudice.

### IV. CONCLUSION

For the reasons set forth above, Aramark's motion is GRANTED; CFG's motion is DENIED; the County Defendants' motion is GRANTED in part and DENIED in part consistent with this Opinion; and Plaintiff's motion to amend is DENIED without prejudice.  An appropriate Order will issue herewith.


Date:  February 8, 2013            s/Renée Marie Bumb
                                   RENEE MARIE BUMB
                                   United States District Judge